154 P.3d 1276 (2007)
2007 OK CIV APP 22
In the Matter of K.N.L., A Deprived Child.
Kevin N. Latham, Respondent/Appellant,
v.
State of Oklahoma, Petitioner/Appellee.
No. 103,304.
Court of Civil Appeals of Oklahoma, Division No. 4.
January 30, 2007.
*1278 Valerie L. Baker, Oklahoma City, OK, for Respondent/Appellant.
C. Wesley Lane II, District Attorney, Lory K. Oller, Asst. District Attorney, Oklahoma City, OK, for Petitioner/Appellee.
Released for Publication by Order of the Court of Civil Appeals of Oklahoma, Division No. 4.
DOUG GABBARD II, Presiding Judge.
¶ 1 Appellant, Kevin Latham (Father), appeals from a trial court order terminating his parental rights to his child, K.N.L., following a jury trial. We affirm.

FACTS
¶ 2 On July 4, 2002, two-year-old K.N.L. was taken into protective custody by the Department of Human Services (DHS) after the child's mother (Mother)was arrested on a charge of destruction of property. Mother and Father had been separated since 2001, and Mother was living with her boyfriend.
¶ 3 A week later, the State of Oklahoma (State) filed a petition alleging that K.N.L. was deprived because Mother had been unable to provide a suitable home and the home was unfit due to domestic violence. The petition also alleged that Father had failed to establish a meaningful relationship with, and had failed to provide financial support for, his child. Mother eventually stipulated to the deprived adjudication, and her parental rights were subsequently terminated.
¶ 4 When the petition was first filed, State was unaware of Father's location. Father, now living in Texas, was aware of the pending action as early as August 2002, but did not contact the court regarding the matter. In May 2003, he was incarcerated in a Texas prison for violating the terms of his probation on an aggravated assault charge. In December 2003, State learned of his incarceration. Aware that Father had a history of substance abuse, State amended the petition to allege that K.N.L. was also deprived due to Father's substance abuse and criminal history.
¶ 5 Father was released from prison in January 2004 and immediately contacted the court. He agreed to a voluntary service plan, and exercised monthly visitation with K.N.L. until September 2004. At that time, State learned that Father was using methamphetamine again, and temporarily suspended visitation. At State's request, an adjudication hearing was held on December 13, 2004. Father stipulated to the allegations of State's amended petition, and the court adjudicated K.N.L. deprived as to Father on grounds that Father had failed to provide proper parental care and guardianship, that his home was unfit due to substance abuse and a history of criminal activity, and that he was incarcerated when the child was placed in DHS custody.
¶ 6 In January 2005, the Court adopted a treatment plan requiring Father to enroll and actively participate in substance abuse, domestic violence, and anger management treatment. Father was also required to take a parenting skills course, maintain employment, attend Alcoholics Anonymous/Narcotics Anonymous meetings, have random urinalysis testing, provide a safe home environment for his child, visit his child, and have monthly contact with DHS. Father had one more visit with K.N.L. on January 20 or 21, 2005. Thereafter, he had no further visits or contacts with K.N.L. After March 2005, he also had no further contact with his DHS worker. In April 2005, he failed to appear for a hearing in the juvenile case. In May 2005, his Texas parole was revoked for failing to report, and he was again incarcerated. After learning that Father was again in prison, State filed an amended petition requesting termination of Father's parental rights on the grounds of abandonment and failure to correct the conditions leading to the deprived adjudication.
¶ 7 In March 2006, a jury trial was held on the petition to terminate parental rights. Because Father was incarcerated in Texas, he was unable to attend the trial. However, he was represented by court-appointed counsel and his testimony was presented by way of deposition. At the conclusion of the trial, the jury found that the allegations of the petition to terminate were true and that termination was in the best interests of the child. The trial court subsequently entered an order terminating Father's parental rights. Father now appeals, arguing that his constitutional rights were violated by trial in *1279 his absence and that the evidence presented was insufficient to justify termination.

STANDARD OF REVIEW
¶ 8 In reviewing a claim that the procedure used in a termination hearing resulted in a denial of a constitutional right, such as due process, appellate courts review the issue de novo. "De novo review requires an independent, non-deferential re-examination of another tribunal's legal rulings." In re A.M. & R.W., 2000 OK 82, ¶ 6, 13 P.3d 484, 487. In examining whether there is sufficient evidence to support an order terminating parental rights, we review the record for clear and convincing evidence in support of the decision to terminate. See In re S.B.C., 2002 OK 83, ¶ 6, 64 P.3d 1080, 1082-83. "Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." In re C.G., 1981 OK 131 n. 12, 637 P.2d 66, 71.

ANALYSIS
¶ 9 Father initially presents several arguments to support his contention that conducting the termination hearing while he was involuntarily absent violates his constitutional rights to due process, equal protection, and confrontation. State responds that these same arguments were resolved in In re Rich, 1979 OK 173, 604 P.2d 1248. In that case, the father was incarcerated in a Texas prison and unable to attend the Atoka County, Oklahoma, trial to terminate his parental rights. The Father was represented by court-appointed counsel and could have, but did not, seek to present a deposition of his testimony at trial. On appeal of the termination order, he alleged violations of his rights to due process, equal protection, and confrontation of his adversary. The Oklahoma Supreme Court held:
The Father's presence at these proceedings was not the only effective means of fairly meeting the issues. He was hence, by his absence, denied no opportunity for a fair and just hearing. Courtroom confrontation with one's civil adversary is not required either by due process or other constitutional strictures.
Id. at ¶ 13, 604 P.2d at 1253. Father admits that the Rich case is applicable, but argues that intervening decisions, which he does not name, cast doubt upon Rich's continued application.
¶ 10 In the 27 years since Rich was decided, a number of federal and state decisions have addressed the due process required for termination hearings. In 2000, the Oklahoma Supreme Court held that arguments challenging due process should be reviewed using a two-step inquiry: "whether the individual possessed a protected interest to which due process applies and if so, whether the individual was afforded an appropriate level of process." In re A.M. & R.W., 2000 OK 82 at ¶ 7, 13 P.3d at 487 (citing Daniels v. Williams, 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).
¶ 11 Parents clearly have a constitutionally protected liberty interest in the parent-child relationship. See In re D.D.F., 1990 OK 89, 801 P.2d 703. However, determining the appropriate level of process which is due is more problematic. The only absolute due process requirements in a termination case are prior notice of the hearing, an opportunity to be heard, and the right to effective assistance of counsel. See id.; Tammie v. Rodriguez, 1977 OK 182, 570 P.2d 332. We review other procedural claims by determining whether the party was afforded the essence of procedural due process, that is, a "meaningful and fair opportunity to defend." In re A.M., 2000 OK 82 at ¶ 9, 13 P.3d at 487. Due process is not a static concept, but is determined according to the facts and circumstances of each case. McLin v. Trimble, 1990 OK 74, 795 P.2d 1035 (citing Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 902-03, 47 L.Ed.2d 18 (1976)).
¶ 12 In determining whether a particular trial procedure gave a meaningful and fair opportunity to defend, the Oklahoma Supreme Court has adopted the Mathews[1] *1280 three-part balancing test: First, a court must consider the private interest that will be affected by the state's action; second, the court must consider the risk of erroneous deprivation of the interest posed by the procedures used and the probable value, if any, that additional or substitute procedures would provide; and third, the court must consider the governmental interest at stake, including any administrative and fiscal burdens that alternate procedures would generate. See In re A.M., 2000 OK 82 at ¶ 10, 13 P.3d at 487-88.
¶ 13 The first and third parts of this test were considered by the Kansas Court of Appeals in In re J.L.D., 14 Kan.App.2d 487, 794 P.2d 319 (1990), wherein it is stated:
Loss of parental rights is extremely important, but it should be weighed against the loss by the child of the right to a prompt judicial determination of his status. A prisoner serving a lengthy prison term should not be able to use his due process rights to foreclose permanently any severance proceedings.
A child should be afforded the opportunity to have a childhood complete with a family and caring parents. For J.L.D., his only hope for parents who can attend to his needs is through adoption.
Id. at 322.
¶ 14 This analysis is particularly applicable to our case. Between the emergency custody order and Father's scheduled release from prison in 2010, eight years of K.N.L.'s young life will have passed with little contact by the child's biological father. Moreover, the child has clearly expressed a desire for stability, permanency, and adoption. Considering all these factors, we conclude that Father's right to be present at a hearing three years from now is outweighed by consideration for the child's welfare. This finding is consistent with the legislative intent, expressed in 10 O.S.2001 § 7006-1.1(A)(12), directing trial courts to consider "the duration of incarceration and its detrimental effect on the parent/child relationship" as one of the factors for determining whether the continuation of parental rights would result in harm to the child.
¶ 15 The third part of the Mathews test, consideration for governmental interests and alternate proceduresis also easily resolved in this case. Father cannot be present at trial until 2010. If the trial court had waited to conduct a hearing, a total of eight years would have passed since the child was taken into custody. Both State and the child have a right to an earlier hearing. Moreover, Father's physical presence was not the only effective means he had to meet the issues involved in this case. He was represented by counsel and availed himself of the right to present testimony by written trial deposition. He could have testified by videotape. He could have conferred with his attorney by telephone concerning the progress of the case, in order to assist with jury selection, cross examination, and trial tactics. It may have been possible for him to actively participate during the trial by telephone or video. Present technologies present far greater opportunities for participation than were available when Rich was decided in 1979. Ultimately, Father fails to demonstrate how his absence constitutionally violated his due process rights in relation to jury selection,[2] cross-examination of witnesses, presentation of evidence, or his defense generally.
¶ 16 We also find no violation of Father's right to equal protection under the Fourteenth Amendment, or to confront and cross-examine witnesses under the Sixth Amendment. There is no disparity in treatment between parents incarcerated in-state and those incarcerated outside the state. Instate prisoners have no greater right to appear in court termination proceedings than *1281 those incarcerated in another state. See In re Rich, 1979 OK 173, 604 P.2d 1248. Furthermore, the Sixth Amendment's right of confrontation applies only to criminal cases, not to civil trials. See Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); Kiddie v. Kiddie, 1977 OK 69, 563 P.2d 139; In re A.M., 2000 OK 82 n. 7, 13 P.3d at 487.
¶ 17 We conclude that Rich is still viable. An incarcerated parent does not have an absolute constitutional right to be present at a termination hearing, if through the exercise of reasonable diligence his presence cannot be secured within a reasonable time period and alternate effective procedures are available to protect his or her fundamental right to "meaningful access" and an opportunity to defend. Nearly every other jurisdiction that has considered the question has reached the same result. See, e.g., Valero v. State, Dept. of Human Res., 511 So.2d 200 (Ala.Civ.App.1987); In re Jesusa V., 32 Cal.4th 588, 10 Cal.Rptr.3d 205, 85 P.3d 2 (Cal.2004); J.T. v. Marion Co. Office of Family & Children, 740 N.E.2d 1261 (Ind.Ct.App.2000) (abrogated on other grounds in Baker v. Marion Co. Office of Family & Children, 810 N.E.2d 1035 (Ind. 2004)); In re J.S., 470 N.W.2d 48 (Iowa Ct.App.1991); In re J.L.D., 14 Kan.App.2d 487, 794 P.2d 319 (1990); In re Randy Scott B., 511 A.2d 450 (Me.1986); In re Vasquez, 199 Mich.App. 44, 501 N.W.2d 231 (1993); In re H.G.B., 306 N.W.2d 821 (Minn.1981); In re F.H., 283 N.W.2d 202 (N.D.1979); Najar v. Oman, 624 S.W.2d 385 (Tex.Ct.App.1981); State v. Vargas, 736 P.2d 1031 (Utah Ct.App. 1987); In re Darrow, 32 Wash.App. 803, 649 P.2d 858 (1982); In re Adoption of J.L.P., 774 P.2d 624 (Wyo.1989).
¶ 18 Father also contends that the jury verdict and order of termination are not supported by clear and convincing evidence. The jury found termination of Father's parental rights authorized on grounds of abandonment (10 O.S.2001 § 7006-1.1(A)(2)) and failure to correct the conditions leading to the deprived adjudication (10 O.S.2001 § 7006-1.1(A)(5)). The jury heard the testimony of five witnesses.
¶ 19 DHS worker Michelle Boyer testified that she was assigned to K.N.L.'s case in 2004, and stated that, although Father completed a portion of his treatment plan, he failed to substantially complete the plan or correct the conditions leading to K.N.L.'s deprived adjudication. Boyer testified that Father did not attend approved substance abuse counseling, did not undergo domestic violence treatment, had not been subject to random urinalysis testing, had not provided evidence of regular employment, had not stayed in monthly contact with her, and had been re-incarcerated. She also testified that Father had not visited K.N.L. since January 2005, that continued foster care placement was not in K.N.L.'s best interests, and that termination of Father's parental rights was.
¶ 20 DHS worker Randy Lack testified that K.N.L. had been in four foster care placements, and that the latest appeared to be successful. Lack testified that Father had only visited the child approximately 15 times during the last four years, practically all of those visits occurring between March 2004 and January 2005. Lack testified that the child called Father "Kevin," not "Dad," that the child does not ask about Father, and that the child had indicated a desire to be adopted by her foster parents. Lack also testified that Father had not attempted to contact K.N.L. during Father's present period of incarceration, and that it would not be in the child's best interests to have to wait until 2010 to attempt reunification with Father.
¶ 21 Melody and Raymond Hill testified that they had been the child's foster parents since October 2004. Ms. Hill testified that the child initially had kicking and screaming fits, but was now happy and compliant. Ms. Hill also testified that K.N.L. cried and did not want to attend the last visit with Father in January 2005. Finally, she testified that K.N.L. wants a family and "wants to know that that's where she belongs and that she's always going to belong there."
¶ 22 In his deposition, Father admitted using methamphetamine over several years, including the period when he lived with Mother. He testified that he separated from Mother in 2001 and attempted to take K.N.L. *1282 with him to Texas, but Mother refused. He admitted learning of the juvenile action in August 2002, but did not appear before the Oklahoma court because an unnamed DHS worker told him "there was no reason for me to come to court at that point in time." He admitted violating his Texas probation and being incarcerated between May 2003 and January 2004. He stated that he took a parenting class while he was in prison. He stated that he immediately contacted DHS after his release from prison. He admitted violating the service plan with additional illegal drug usage in August 2004. However, he stated that he only used drugs for two weeks, at which time he alleged that he began intensive outpatient treatment and random drug testing. He stated that he had maintained employment as required by the treatment plan until May 2005 when he was re-incarcerated for violating his Texas probation by failing to report. He stated that he would be eligible for parole in February 2010. He also testified that he loved his daughter very much, that he regretted what he had put her through, and that he was not willing to give up his parental rights because he wanted the opportunity to be a dad again.
¶ 23 Abandonment justifying termination of parental rights is defined in 10 O.S.2001 § 7006-1.1(A)(2)(c) as occurring when:
c. the parent fails to establish and/or maintain a substantial and positive relationship with the child for a period of six (6) consecutive months out of the last fourteen (14) months immediately preceding the filing of a petition for termination of parental rights. For purposes of this paragraph, "establish and/or maintain a substantial and positive relationship" includes, but is not limited to:
(1) frequent and regular contact with the minor through frequent and regular visitation and/or frequent and regular communication to or with the child, and
(2) the exercise of parental rights and responsibilities. Incidental or token visits or communications shall not be sufficient to establish and/or maintain a substantial and positive relationship with the child[.]
¶ 24 In this case, Father consistently exercised visitation with K.N.L. from March 2004 through September 2004. His last visitation was on January 20 or 21, 2005.[3] The petition to terminate parental rights was filed on June 15, 2005. Thus, the record does not support a finding that Father failed to visit or communicate with the child for six consecutive months out of the 14-month period preceding the filing of the petition to terminate. There also was scant evidence that Father failed to maintain other required parental rights and responsibilities for the statutory period. Accordingly, we find insufficient evidence to sustain the verdict based on abandonment.
¶ 25 In proving that a parent has failed to correct the conditions leading to a deprived adjudication, 10 O.S.2001 § 7006-1.1(A)(5) requires four findings:
a. the child has been adjudicated to be deprived, and
b. such condition is caused by or contributed to by acts or omissions of the parent, and
c. termination of parental rights is in the best interests of the child, and
d. the parent has failed to show that the condition which led to the adjudication of a child deprived has been corrected although the parent has been given not less than the time specified by Section 7003-5.5 of [Title 10] to correct the condition[.]
¶ 26 Father does not contest that the first two parts of the test were met.
However, Father contends that he made reasonable efforts to correct the conditions leading to the adjudication, although he was not totally successful by the trial date. Such evidence may sometimes be sufficient to defeat termination on this ground. For example, in In re J.L., 1978 OK 37, ¶ 16, 578 P.2d 349, 351, the Oklahoma Supreme Court reversed a judgment terminating parental rights where the evidence as a whole showed the parent "made sincere and extensive efforts" to change the conditions leading to the deprived adjudication, although she had not been totally successful. See also In re J.M., 1993 OK CIV APP 121, 858 P.2d 118.
*1283 ¶ 27 We find no similar evidence in this case. Father made little effort to comply with the treatment plan. He did not complete recommended counseling or provide sufficient proof thereof, exercise regular visitation, regularly contact his DHS worker, or refrain from using drugs. Since the inception of this case in 2002, Father has twice been incarcerated for probation or parole violations. Father has not made a substantial effort to correct the conditions leading to adjudication, is not presently capable of providing for his child's basic needs, and will not be capable of meeting those needs for a substantial period. The evidence clearly supports the jury's verdict that Father has failed to correct conditions.
¶ 28 State must also prove by clear and convincing evidence that termination is in the child's best interests. Absent such proof, there is a presumption that the best interests of the child are served by leaving the parent-child bond intact. See In re K.C., 2002 OK CIV APP 58, ¶ 5, 46 P.3d 1289, 1291.
¶ 29 Here, Father testified that he loves and cares for K.N.L. and desires to have a relationship and resume parental responsibilities when released from prison. However, the reality is that he has been unable to do so for almost all the child's young life, and that he will be unable to do so for at least another three years. When Father is released from prison in 2010, K.N.L. will be more than 10 years old and will have had virtually no contact with her biological father. We are mindful that "the paramount consideration in proceedings concerning termination of parental rights shall be the health, safety or welfare and best interests of the child." 10 O.S.2001 § 7006-1.1(A). K.N.L. desires and deserves what every child is entitled to: permanency, a stable home, and loving parents. The record presents clear and convincing evidence supporting the jury's verdict that termination is in the child's best interests.

CONCLUSION
¶ 30 For the reasons set forth above, the order of termination is hereby affirmed.
¶ 31 AFFIRMED.
GOODMAN, J., and REIF, J., concur.
NOTES
[1] We note that Mathews was specifically applied by the U.S. Supreme Court to termination proceedings in Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The Oklahoma Supreme Court adopted the Mathews test in Wood v. Ind. Sch. Dis. No. 141, 1983 OK 30, 661 P.2d 892.
[2] In one of his propositions of error, Father specifically claimed that his absence was in violation of due process because it prevented proper jury selection. In In re C.J., 2005 OK CIV APP 66, 121 P.3d 1119, another division of this Court found that a parent's involuntary absence during jury selection at her termination trial was not a violation of due process.
[3] See State's Exhibit 5, pages 2-3.